The next case is Berger v. Philip Morris. Mr. Michael is here. Well, let's see. Mr. Michael is here for, we've got appeals and cross appeals. I think Mr. Michael is here for Berger. And Mr. Isheroff is here for Philip Morris. Is that right? The other way around? Okay. Mr. Isheroff, and I'm here for Mr. Berger, and Mr. Michael is here for Philip Morris. All right. Thank you. And Mr. Michael, you may begin when you're ready. You're here for Philip Morris. Yes, Your Honor. Okay. He's the appellant and cross appellee. May it please the Court. Since the time when this case was tried, Florida state courts have reversed Engle progeny case after Engle progeny case based on the very same types of improper arguments that plaintiff's counsel employed here. Plaintiff's counsel compared my client to a pedophile or a criminal who abducts children. This was in rebuttal, right? Rebuttal closing. Correct. That was in rebuttal over objection. Okay. Against Philip Morris's attempts to blame Berger for disobeying her father and smoking. That, I think, misrepresents. It is what plaintiff says in their brief and what plaintiff said in rebuttal closing argument. I think it misrepresents our closing argument. Our closing argument was not blaming a child. Our closing argument was that Mrs. Berger could have quit when she was 25, 30, 35 and avoided her injuries. And you know she had the information to quit because even going back to when she was a child, she had information from her father. I guess the reason that I'm asking the question is because we said in United States v. Smith that the fair response rule permits a party to respond to opposing counsel's comments. And they say that's all they did in their closing argument is fairly respond to your closing argument. Right. And that is what they say, but this is not fair response. Fair response might have been, well, first, fair response, you need an improper argument to begin with. And then that prejudice is minimized on the other side's improper argument because you're balancing out. Here, a fair response might have been in terms of advocacy. You don't blame a child who touches a hot stove because their parents told them don't touch a hot stove. I mean, aren't we, in fairness, I mean, aren't we kind of slicing the bologna a little thin here underneath, you know, within the context of an abusive discretion standard? I mean, we've got case after case after case talking about how district court judges have all kinds of latitude for managing courtroom proceedings and closing arguments in particular, right? Right. But you also have cases like Allstate v. James where a single improper argument, where you have an overruled objection, where it occurs during rebuttal, all of those hallmarks can be sufficient to overturn a district court judge's denial of a new trial motion or denial of a mistrial motion. Is there any reason to believe that the jury could not follow the district judge's curative instruction? Well, we have, in the end, a $27 million award, Debbie, by the jury, which is certainly on the high side, outlier side of angle progeny cases. And you have that they got the fraud question just completely wrong because there was insufficient evidence on fraud. Yet they knew that fraud was their one vehicle to get to punitive damages, to get to that $20 million plus award in punitive damages. So I think that that's a large amount of evidence. I want to make sure this court, though, understands just how insidious the denigrating our defense argument was by plaintiff's counsel because their historian testified that the historical fraud had two catchphrases he used, was creating doubt by the tobacco companies, creating doubt about the health charges, and putting out distraction science. Now, their argument, the improper argument, came when they split closing arguments. The only topic of the arguer at the time by plaintiff's counsel was the medical question of when Mrs. Berger's COPD manifested. Was it within the class window? It was within that question that he said, well, what evidence did Philip Morris bring you? And he said, they brought you distraction science. You heard about that from Dr. Proctor. So there's no doubt that he was saying that what our counsel did was try to perpetrate that same fraud on the jury in the courtroom. And that, at the time, was an argument that was routine in Engle progeny cases that since then has formed the basis of reversal in Gaffney, Robinson, Callaway, David Cohen. So this court should recognize that this is not just an in-passing argument. And the objection was overruled. So the jury got the impermature from the district court that it was a proper argument. So you're saying, and I'm sorry if I missed this in the brief, you're saying that Florida courts have reversed Engle progeny cases for distraction science and doubt creation arguments in closing? Well, I wouldn't say those terms. But the argument that's been made and formed the basis of reversal is where plaintiff's counsel denigrates the defense of the case. And the way that's done is by saying that the same historical fraud you heard about for 50 years of the tobacco companies creating doubt, you heard that same thing from defense counsel in this courtroom where they didn't, for example, prove that it was not COPD or that COPD was outside the class window. They just tried to create doubt about that and use the burden of proof. And so that's linking the defense counsel's conduct to the historical fraud. And there's many varieties of that argument, but it's completely insidious because just in Allstate v. It essentially said your insurance rates might go up because of cases like this. And that similarly makes it personal for this jury that not only was all of America subject to historical fraud, but in this courtroom you were subject to a fraud by defense counsel. And it also, it does so in a way that violates essentially our due process rights to prevent, to present a defense, because saying that by failing to just confess liability, we're doing something wrong in the courtroom. And then the third type of argument is, of course, the vouching, the calling our behavior sick and disgusting. This was not something that was tracking the punitive damages standards, such as reprehensible or something like that. It was a counsel who the jury knew had tried, you know, that there are many Engle progeny cases out there, looking at it and telling the jury that this particular conduct was sick and disgusting. So for all those reasons, we think that we should have a new trial on all issues, which would move the remaining issues. Except, well, we keep the JMOL on fraud alive because that won't be part of the new trial. So I did want to discuss that briefly. There's not much I can add to Judge Carr's decision. It's very thorough in his recitation of the evidence. He also not only has his main decision, but I want to make sure I highlight that he had a reconsideration decision after plaintiffs moved for reconsideration, wherein he rebuts many of the arguments and attacks on his main decision. So let me ask you this. I know your time is limited, and I actually think this is kind of the driver of the case for me anyway, this issue. So I gather that the real question, given the way that the law operates in Florida with this, you know, sort of presumption or inference of reliance in an omissions case, which I think is not a radical notion. I mean, I think that's how it works in 10b-5 cases as well, right? And so given that you've got this sort of presumptive inference of reliance, is the question here whether essentially Mrs. Berger in her own testimony sort of talked her way out of that inference, testified her way out of that inference, rebutted the inference by her own testimony, is that the idea? No, Your Honor, it's not. So this is not a 10b-5 case. There is not a presumption of reliance based on fraud on the market. That's been never held in Florida. There's Florida cases that say, you know, you can't have fraud on the market. What you have is that Florida courts have affirmed reliance verdicts against us, where they have said that based on the pervasiveness of the misleading information, a reasonable jury, and based on the plaintiff's testimony in this case, a reasonable jury can infer that the reliance was on the misleading information. So that would be, for example, in a case where you had a smoker say, I smoked lights because I thought they were safer. And I saw the advertising that said lights, they looked healthy on those ads. But didn't the district court here even say, look, I mean, you know, she was, I'll give you this, she was exposed to the misinformation campaign and that it was, you know, caused some level of misunderstanding or confusion, right? And isn't that under Florida law? I guess, I mean, you know, the case, the most recent case I've read, it seems to summarize this area of the law is called Dignan or Dwegenon or whatever. I mean, it seems to account for this inference slash presumption, whatever. And then it sort of tends, seems to shift the burden to you to conclusively prove otherwise. And I thought that this case boiled down to the fact that the district court concluded, yeah, the testimony conclusively proves otherwise. Well, and I would refer, Your Honor, to Judge Carr's reconsideration decision on Martin and the inference, where he says that that is, that's not Florida law, that the burden is shifting. I agree with, Your Honor, that even if there was burden shifting, we've rebutted the presumption here. However, Martin is just a reasonable inference under Judge Carr's reading. So I'm interested. And if it went beyond that, it wouldn't apply in federal court. So while I'm interested, I actually think it might apply in federal court. I think that you can sort of merge the JML standard with the Florida, sort of the way Florida law sort of manages the elements of a concealment claim. But I'm interested in how it is exactly that the evidence conclusively proves nonreliance, if you will. If we're going to go down this presumption slash inference trail, then what is it precisely that conclusively proves nonreliance? Well, I just want to make sure that that is not the federal standard that conclusively proves, and that would violate many cases. Does that come out of Florida law? Where have I gotten that? I thought the judge said that, frankly. I thought the district court judge said it. No, the evidence, we don't need to, it's plaintiff's burden of proof. So the standard is whether or not there's evidence by which a reasonable jury could find in plaintiff's favor. Right, got it. So our argument is there wasn't evidence by which a reasonable jury could find reliance, not that we conclusively disproved that reliance didn't happen. But the evidence of that is you've got to take it pillar by pillar. Lights, cigarettes fraud, implying that lights were safer. She was asked, did you smoke lights because they were safer? And said, no. Right. Sorry to interrupt, but I need to ask about punitives before your time is up. If we, if this court should affirm the lower court with respect to the reliance, there's the issue of the punitive damages. Yes, Your Honor. Tell me what evidence would apply to, as to punitives, would apply as to negligence and strict liability that would not apply to reliance. In other words, how is this evidence going to be different? Right. I shouldn't ask you to point out all the evidence against you, but I'm going to ask that of the plaintiffs as well. Well, where punitive damages are concerned with strict liability, it involves a product design as opposed to the disinformation campaign. So we would, for example, call a cigarette designer to rebut claims that we manipulated nicotine or that we made design decisions in order to make cigarettes more addictive. In this case, we did not call a cigarette designer to testify because there was no punitive damages on strict liability. So it's not just the evidence, though. It's the standards. So this jury found that we are liable for an intentional tort, and intentionality essentially mimics the punitive damages willful wanton. And if they wrongly found that, which we think they did, they were wrongly believing that we already were liable for willfully harming Mrs. Berger when deciding punitive damages. On the strict liability torts, there's no initial finding of intentionality. So you can't just take the jury's finding on intention that already presumes. Just a reasonably dangerous product. Exactly. Yeah, so we'd be able to explain that even if it was defective, here's why we made our decisions. And I would like to reserve. So you'll have your rebuttal time, but I've just got to follow up. So without sort of getting into a dispute about sort of how the inference does or doesn't apply, you would agree that the fundamental question on the reliance element of a concealment claim is whether the plaintiff would have acted differently had she known the full truth, right? I mean, that's the bottom line of the reliance element, right? Well, I would put it had she not been misled by the false information from the defendant. Or the nondisclosure, right? I mean, if this is a concealment case, we're talking about nondisclosure. Right. Well, yes, it's nondisclosure, but it's not failure to warn. Fine. So it's that she was misled because we did something that we said. Fine. I think we're on the same page. So why is it, just explain to me why it is, even with her answers, did you start smoking sort of because you were misled? No, I started smoking because of peer pressure. That's the only reason. Why did you start smoking light and filtered cigarettes? Because I liked, I don't know, they kept loose tobacco out of my mouth and they tasted better, whatever it was that she said. That's the only reason. But why couldn't a reasonable juror still nonetheless conclude that if she had known that holy cow, cigarettes are, like, really bad for you and really addictive, that those considerations might have overcome her personal preferences, peer pressure and personal preferences for loose tobacco out of her mouth and taste? That would be sheer speculation. There was no evidence to support that notion. We've put in our brief some of the awareness evidence, but you had cigarette warnings going on the packs in 66, changed in 85, and 66, 69, and 85, stronger and stronger warnings, and there's no evidence that she said, Well, wait a second, now if I had known that, I would have never started smoking. She testified. She was alive. There was none of that evidence. It would be just sheer speculation. And, well, before you conclude now, Ms. Berger is deceased now? Correct. We've got letters back and forth, but no motions or anything of that nature. I mean, tell us what effect that should have on whether or not we should issue an opinion in this case. Right. So I think our main concern was authority from our letter, that plaintiff's counsel's authority to act dissolved with Mrs. Berger's death. It appears now that a personal representative has been appointed. If we have a motion that shows that they have authority to act for the estate, then that issue is resolved, but we do think that that would need the substitution and reappearance almost of counsel should occur before an opinion issue. So, in other words, if a personal representative is appointed for her estate, then this appeal should proceed? I think so, yes. Thank you, counsel. All right. Mr. Zacheroff. Thank you, Your Honor. There are many issues before the court, and as cross-appellant, I don't have rebuttal time, so I'll try to package everything into this. First of all. Can you start with that last point first? Yes, Your Honor. We had been in touch with Mrs. Berger regularly. This case went to judgment in 2015. It was held during the pendency of Graham. The last couple of times we've tried to be in touch, we didn't get answers at the home. We called many times recently, and that's when we learned that, in fact, not only was she deceased, but her husband is no longer capable of answering the phone. The neighbor had been taken care of by a man by the name of Bernard Cote. We went to the Florida courts on his behalf, and he has been appointed a personal representative. We will file all the appropriate motions after this argument. We wanted to confer with counsel to get their approval after the hearing, and this will be cleared up in no time. Florida law makes it possible for a personal representative to retroactively ratify everything, so I don't think there's any issue for this court. All right. With regard to the first appeal, I think that there was misconduct at the hearing, but the misconduct was by defense lawyer. Defense lawyer opened the case by talking about call girls and prostitutes, repeatedly in questioning the terms hookers, only hookers smoke cigarettes, it's not glamorous because prostitutes do it, and then in the closing they went back to this theme and they said she knew it wasn't glamorous because her father told her, and at that point we said she's 14 years old, she's 13 years old even when she started smoking, and that's an entirely appropriate rebuttal under Smith. They introduced the theme of the irresponsibility of a minor, and we said minors are minors for a legal reason. They don't have the authority to make these kinds of decisions on their own. That's why you're not supposed to engage in this conduct vis-a-vis minors. Second, on all the cases in Florida that reversed because of the vilification of the position taken in defense, it is the vilification of defense counsel as being part of the conspiracy. That's what the predicate is in all those cases. There's nothing like that here. It was a comment on the science. It was doubt science. It was junk science. That's what was put forward, and there's nothing inappropriate about that, and when they tried to blow this up into they're saying that we are part of a conspiracy by our defense here, the judge, Judge Carr, said clearly on the record, I don't understand them to be saying that at all, and as soon as that was said, our counsel, Mr. Oliver, moved on to another topic. This was not raised again, and that's the end of it. There is nothing that looks like this. There's nothing inappropriate in this at all, and I think that these are make-weight issues on appeal. If I can turn to the cross-appeal, which I think is the real issue in the case, I think Judge Newsom is entirely right. The Dynon case or Dweenion, we've had a debate. I don't know how to pronounce it. Whatever. Whatever, but I'll call it Dynon because that's what my co-counsel says. It's much more sophisticated than Dignon, which is what I was calling it. I was going to go Dweenion, but I didn't know if it was French. That's just snooty at that point. Okay. I'm sorry. I won't go there. The Dynon case sets out the standard of Florida law, and the standard of Florida law exposes the clear legal error that the district court made. This court in the Allstate case and, again, in Molina's bias said, if you're going to disregard the intermediate decisions of the Florida courts of appeals, and here we have the court rejecting the Martin standard openly, the burden on the district court is not to say I would do it differently. It's to make an informed prediction, and Allstate says some persuasive indication, Molina's bias says persuasive evidence, demonstrating that the Florida Supreme Court would reject the standard that's being put forward. In the Dynon case at page 440 of the printed opinion, the court, the intermediate court in Florida, carefully goes through Florida law on omission cases, and it cites to section 550 of the restatement, which is fraudulent concealment, and to case law in Florida going back to a Supreme Court decision in 1947 called Joyner v. McCullers, and the standard from Joyner is fraud where, in addition to nondisclosure, the party uses any artifice to throw the other party off his guard. That's the standard. It's nondisclosure plus any artifice. A jury could reasonably conclude from the evidence here that by not disclosing the scientific evidence, by casting doubt on it, and as Mrs. Berger testified, she wasn't sure the surgeon general information was accurate because there was a lot of doubt about it. It was uncertainty. They were not sure. We go to the record in this case. We go to the transcript. Would I find any testimony by Berger that she relied on Philip Morris' advertising to smoke cigarettes? Yes. There is a part in the transcript where she said, I saw the advertisements. Because of the advertisements, I thought I should try other cigarettes, and this has to do with the advertisements that were made about tobacco in the mouth. She doesn't conclusively say in her testimony that I started smoking because of peer pressure? Oh, she does, yes. Yes, the question you asked, I thought, Judge Wilson, was whether there was anything in the transcript where she says she saw ads and so forth. She was very candid. What is it? Is it the advertising or is it peer pressure that caused her and her sister to start smoking cigarettes? Well, if this case had been in state court, every state court has recognized that you cannot disaggregate the two in the context of pervasive advertising pressure that was put on. The testimony at trial was that a child of her age, at 13, 14, was seeing 50 hours a year of cigarette ads, that they were pushing it all the time, including the ad campaign by Philip Morris that ultimately killed her, which was the ad campaign how young girls should learn to inhale. I haven't looked at the transcript yet. I've read the briefs, but Philip Morris says in their briefs that during her testimony, she even denied being influenced by advertising. Is that an incorrect description of what's in the transcript when I go look at it? That is a mild overstatement, but I don't want to rest on that. It is clear that she testified honestly. I cannot point to a single ad that influenced me to start smoking. That's absolutely correct. A 13-, 14-year-old would have been exposed to dozens of hours of these ads routinely on television. They could not testify to that. But the point I want to come back to is the point Judge Newsom raised, because in his opinion, Judge Carr, at page 21 of tab 155, relies on section 548 of the restatement to establish the legal standard of what she had to prove, and he says she had to prove that some ads she relied on affirmatively. 548 of the restatement, it deals only with affirmative misrepresentation. So that's I'm selling you a car, and I tell you it's a Cadillac, but it's really a Chevy, and you have to identify the misrepresentation. Omission cases are different, and the Dinan opinion goes back to the restatement and says if somebody sells you a car, and they back it up against the wall, and it turns out the trunk is rusted out, and you never looked in the trunk, and they never said anything about it, that's fraud by omission. What statement could you possibly point to in that circumstance? Under Judge Carr's test, Florida law would reject a fraudulent concealment claim under those circumstances. Dinan establishes that that's not Florida law, at least since 1947, and the adoption of the standard from the first restatement, that has not been Florida law. But still, isn't the issue whether your client really rebutted the inference? In other words, I agree. I took a look at the, whatever the name is, Dinan case, and in that case, really the court was discussing the propriety of a jury instruction. And I understood Judge Carr to say, yes, we have the Martin case. We have the inference, but this particular smoker has testified, and her testimony rebutted that inference. I don't agree that that's what Judge Carr said. What Judge Carr said, we have Martin. This may satisfy Martin. I reject Martin. I think the Florida Supreme Court would reject Martin because it is incorrect, and that's where he relies on the wrong section of the restatement to predict what Florida law would say. Since that time, for example, in the Hess case, which is a Florida Supreme Court case dealing with the statute of repose, the facts in that case were that the smoker could never identify reliance on any advertisement during the statutory period of the Engle claim. And the Florida Supreme Court said that doesn't matter. It's the conduct that continued. It's not the direct reliance on a particular advertisement. And it's not exactly on point, but it sets the standard under Florida law that we do not look for the direct reliance in these kinds of cases on omission. And I go back to the fundamental eerie point that I began with, which is this case would have come out differently if it had been tried in a state court, and we know that. We know that because the Putney case comes out differently, because Dinan comes out differently, because Martin comes out differently, because Callaway comes out differently. All these cases rely on the pervasiveness of the advertisements, the attempt to create doubt about the health consequences of smoking cigarettes. Can I just get you to hang on for just a second, because I want to make sure that Judge Wright has an answer to her question, because she's got her finger on the same thing that I sort of opened the argument with, which is given the inference that I read out of Dinan, I think fairly, the question for me, and I think the question that Judge Wright is asking you, is did this plaintiff sort of talk her way out of it? And in addition to sort of casting his lot with Martin, the judge did, Judge Carr did sort of say this plaintiff gave some remarkably candid testimony, and she said, I only started smoking because of peer pressure, and I only switched to lights or filters for personal preference reasons. And so then I guess to me that tees up what is the ultimate question, which is whether under the federal standard, a reasonable juror could nonetheless have concluded that had she known the full truth, cigarettes are really bad for you and they're really addictive, that information would have countermanded her personal preferences, and she wouldn't have smoked or would have stopped. And the question is whether a reasonable jury could make that inference, and I agree with you. And if we look at the state court proceedings, what we see is time and again, the courts uphold exactly that outcome. So if we look, for example, at the Hess case again, there again, a candid plaintiff talked his way out of saying, oh, I saw an ad during this 10-year period. Any coached plaintiff could have testified, oh, yeah, I must have seen some ad, the Marlboro Man something during that 10-year period. He said no. And the court said it doesn't depend upon that because of the pervasiveness of the conduct in the period. If we go to the Putney case, we see that the legal standard that the Florida courts are using is whether a jury could conclude that the plaintiff would have behaved differently had she known. And the jury saw Mrs. Berger testify that when her sister, her twin sister, came down with COPD, she then saw the health consequences and tried to quit and could not. So a jury could reasonably infer that had she known the health consequences earlier on, she would. Mr. Michael speaks of the Surgeon General warnings in 1966. That's a decade after she began smoking. And so it's one thing to say, oh, yes, everybody knew, but everybody didn't know. And 13-, 14-year-old children are vulnerable. Let me tell you what I'm struggling with now. Federal law controls questions of the sufficiency of the evidence. Yes, Your Honor. And the permissibility of inferences. That's correct. And so, I mean, your argument is, as I understand it, essentially you're applying, you're relying primarily on Florida rather than federal law. This case was tried in federal court and not in state court. Your Honor, as this court has said in passing a few times, and this is such an elemental point that there's not a lot of case law on this point, neither side has been able to find very much. Yes, the evidentiary questions are under the federal rules of evidence and the inferences, but evidence as to what? And the as to what is critical because the district court said as to the proof of direct reliance as per Section 550 of the restatement. That's wrong as a matter of law. That's just wrong, plain wrong under Erie. He's using federal evidentiary rule to change the substantive law of Florida. Martin, and the court acknowledges this, had this been tried under Martin, she wouldn't have won. The jury verdict would have been upheld because this was a reasonable inference on the omission side. And Judge Carr makes a prediction, as he must in these circumstances, that the Florida courts would reject Martin. In the intervening period, not only have we proven him wrong because of Putney, because of Dinan, because of all these cases, but we see that these cases like the Putney case has gone to the Florida Supreme Court and been sent back for the imposition of judgment based upon the same standard that we think should have applied here, the standard that Dinan identifies most clearly in the Florida courts. So we think that it's not an evidentiary question. It's evidence as to what. And the as to what, under fundamental principles of Erie, must be decided by Florida law. I think further that this court, in cases like Walker and Graham, and most recently in Judge Choflat's opinion in Burkhart, has said that there should be symmetry in the treatment of the substantive claims between the Florida state courts and the federal courts in the Engle progeny cases. That's what all these cases together have resolved. Now there were questions about whether they were intervening federal due process or preemption issues. I know, Judge Wilson, you dissented in Graham. But those federal questions are to the side. As to the substance of state law, there's no dispute after Graham and Walker and Burkhart that this court must try to give the same standard as would obtain substantively in the state courts. I don't think anybody could possibly believe that after Putney, after Dinan, after Hess, after all these cases in the state court system, that had this case come up in the Florida appellate courts, they would have overturned this jury verdict. It's just inconceivable. And I don't think there's any argument made on that score. The only argument that's made is that federal evidence applies. Yes, federal evidence applies, but you have to ask the right substantive question. I think we have your argument, Judge. Can I address the punitive damages question from Judge Wright? You may. Okay. The punitive damages, there's one issue that we won on that is a predicate for punitive damages, even under the district court's ruling, that was never addressed, and that's the conspiracy claim. And in the Putney case, the Florida courts have said that the conspiracy count stands independent of the fraudulent concealment count. So even if they're right on that, we win on conspiracy. In Putney, the facts of record are the jury found against the plaintiff on fraudulent concealment, but found for the plaintiff on conspiracy to fraudulently conceal. And the district court said, I'm sorry, the court of appeals said, citing Florida law, under Florida law, the conspiracy is a standalone tort, and the measure of the damages is the consequence of what happens, and the consequence here being the COPD injury. So we would prevail under that. Even if we do not prevail under any of the intentional torts, the question is what happens on remand. And in SOFR, the Florida court, reading the statute, the Florida punitive damages statute, said that the punitive damages determination is independent of the underlying claim. The underlying claim just simply establishes whether there is sufficient culpable conduct to go to the punitive damages question. That question then stands alone. That's why the Florida court in SOFR rejected a remand that would have included a new trial on the liability question. If you look here at the jury instructions, you see that the jury instructions on punitive damages have in them every element of the Florida statutory requirement for punitive damages. The jury made a finding on each of those questions. So the only issue is whether the negligence would have been different had there been anything else to try there. But the jury was also instructed that they were not to award punitive damages on the basis of negligence or strict liability. And so we know that if the jury followed that instruction, they weren't considering those claims. They weren't considering, but they were considering so much more because the negligence in this case is a given under the Engle findings. So there was nothing the jury had to do there in order to get to the punitive damages question if they found the conduct sufficiently reprehensible. What they did instead was they had to go through all the elements of intentionality on both the conspiracy and the fraudulent concealment, which is a higher standard. So if the higher standard is met, a fortiori the lower standard is met, and there's nothing more to be done. They want to put on evidence that they really were looking out for the smokers' welfare when they manipulated the ammonia levels in the 1970s and 80s. That's fine. That's fine. But that's the Engle trial. We're past that. The negligence and strict liability are established, and every element of the punitive damages has been found. All right. Thank you, Your Honor. We've got it. Thank you, Mr. Zakharoff. Mr. Michael. Thank you. I can clear up one thing definitively, which is it's Degnan because I was at that trial, and we were surprised. So I was right when I started or close. Yes. Okay. Very good. But this court's, I forget which case, but there's a case that talks about district court judges getting cases reversed and thinking, wow, that appeal had no similarity to what happened when the case was actually before me, that the basis for reversal doesn't look anything like what I remember happening. And that's what I think is being walked down on the Martin Road. Plaintiffs' counsel moved for reconsideration after the grant of the JNOV or JMOL on both fraud and conspiracy, and plaintiffs said, you're not following Martin. You need to follow Martin. And Judge Carr did a reconsideration decision. It's November 18, 2015, and said, that is not at all what I'm doing. I am following Martin. And what I'm saying is Martin allows a reasonable inference to be drawn, yes, maybe in cases like Putney and Martin and Hess where you have deceased smokers, where you've got just secondhand testimony about the pervasive advertising and then testimony about what they smoked and they thought lights were safer and all that stuff, but not where you have a live plaintiff like here who specifically says, I did not smoke any cigarette because of advertising, who says, I did not think light cigarettes were safer. So I would urge the panel to take a look at that decision before you think Judge Carr rejected Martin. And then he says, if Martin means that every single Engle progeny case must go to the jury and be affirmed in a jury award on fraud and conspiracy, then I think you're misreading Martin. But if that was a holding that you think Martin has, then that would contravene Engle and Douglas, which came after Engle, that says these trials are about individualized issues of reliance. They're about the individual smokers, not just about the generalized conduct. But that wouldn't necessarily be the result, right? It wouldn't be that every Engle progeny case goes to a jury. It's just that the testimony from the live plaintiff, as you say, would need to be a little bit different or stronger than what you had here. I recognize that Judge Carr thought it was like super strong and conclusive, I think is his word. But, I mean, you might have a live plaintiff who said not just I didn't smoke because of an advertisement, which I think sort of runs to misrepresentation and not concealment anyway, but and not just that I started smoking for peer pressure reasons and not just that I switched to lights and filters because I wanted loose tobacco out of my mouth, but said, oh, no, no, I knew. I saw the Surgeon General's warning, message received, warning taken, and I smoked nonetheless. I loved it. Now that, that case doesn't go to a jury. Right. Well, that, so that, what that is doing is it's taking concealment and converting it to a failure to warrant claim. And there aren't failure to warrant claims here because those are preempted. The nature of an Engle concealment claim is that we made statements that were false or misleading because they concealed information. So like a half-truth case. Correct. That's the basis of the duty from Engle. He mentioned the Hess case. If you read the instructions in Hess, if you read the instructions Judge Carr gave here, it's a half-truth theory. And those instructions, of course, have not been challenged on appeal. I do just want to also remind the Court, Judge Carr did grant a new trial on the manifest way to the evidence as a fallback, as he must on the J&OV decision. That has not been challenged on appeal. That's, of course, a different standard for Judge Carr, different standard of review. So that's the baseline. And on the new trial, the SOFR new trial issue, I think that has also been waived. In their initial brief, they swung for the fences. They said, we want the punitives back. Their issue is on appeal. Their headers, summary of arguments, standard of review, nothing says anything about a new trial. Then they come back in their reply brief or argument and say, well, we want a new trial on the non-intentional torts for punitive damages. It's too late at that point. But our response to that would have been, had they made it in their initial brief, that if there was a new trial on punitive damages entitlement, it has to be a new trial that involves the main liability issues as well, because you've got a gasoline product reexamination problem, where you can't have a second jury reexamining the first jury's findings. And that's an issue from the Seventh Amendment that does not apply in state court. So the state court decisions on that doesn't matter. So I think their request for a new trial on punitive damages was waived. But if this court thinks that they get a new trial on punitive damages, it needs to be on liability issues as well. For all those reasons, I would request this court to reverse the entirety of the judgment. Thank you. All right. Thank you. And that concludes the docket for this morning. The court is in recess until 9 o'clock tomorrow morning. All rise.